## Louisville & Nashville Railroad Company v. Lewis.

(Decided January 21, 1927.)

### Appeal from Lee Circuit Court.

1. Damages—Evidence of Permanency of Brakeman's Injuries Held to Warrant Verdict Against Railroad.—In action against railroad for injuries to brakeman, evidence of permanency of injuries held not so unsatisfactory as to justify setting aside verdict for plaintiff.

2. Damages—$17,500.00 for Permanent Injuries to 29 Year Old Brakeman Held Not Excessive.—$17,500.00 verdict for permanent injuries, depriving 29 year old brakeman, earning over $175.00 a month, of his whole future earning capacity and opportunity for promotion, held not excessive.

3. Master and Servant—False Statement to Obtain Employment Held Not to Bar Recovery for Injury in Service.—False statement in application for employment as brakeman that applicant had been discharged from such employment by another railroad, whereas he had merely given up employment because of injury temporarily unfitting him for service, held not to bar recovery for injuries not caused by former injury, in absence of allegation that he was incapacitated thereby to render service.

4. Trial—Instruction Authorizing Recovery for Pain and Suffering and Loss of Earnings Held Not Erroneous, as Authorizing Recovery for Lost Time, Not Pleaded, or for Future Suffering.—Instruction authorizing recovery of reasonable sum for pain and suffering and fair recompense for loss of what plaintiff otherwise would have earned and deprivation of his earning capacity held not erroneous, as authorizing recovery for lost time, not covered by pleadings, or for future suffering.

5. Appeal and Error—Instruction Ending, "And that but for Such Contributory Negligence . . . Injury Would Not Have Occurred," Held Not Prejudicial, in Absence of Evidence of Contributory Negligence.—Instruction concluding, "And that but for such contributory negligence, if any, the accident and injury would not have occurred," held not prejudicial, if erroneous, in absence of any evidence of contributory negligence authorizing any instruction thereon.

6. **Master and Servant—Instruction on Contributory Negligence of Brakeman Coming in Contact with Shed Moved Nearer Track Without Notice to Him Held Not Justified.**—Brakeman, starting down ladder at side of moving freight car in usual and customary manner, could assume that shed, with which he came in contact, was not so near the track, which had been moved nearer without notice to him only a few days before, and, in absence of evidence that he saw dangerous situation, no instruction on contributory negligence was justified.

WOODWARD, WARFIELD & HOBSON, ASHBY WARREN, HUNT, NORTHCUTT & BUSH, C. S. LANDRUM and ROSE & STAMPER for appellant.

J. MOTT McDANIEL and FRED P. CALDWELL for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER— Affirming.

This is the second appeal. The opinion on the first appeal will be found in 211 Ky. 830, and the same is referred to for a statement of the essential facts.

On the first trial there was a verdict for the plaintiff of $25,000.00 in damages, and on that appeal the judgment was reversed primarily because of excessive damages, it being held therein that the evidence of the permanency of the plaintiff's injuries was not of that positive and satisfactory nature necessary to sustain so large a verdict. The opinion on that appeal likewise discussed other questions not now involved, and incidentally pointed out some defects in the pleadings, which upon the return of the case were cured by an amendment. In an amended answer the defendant not only denied certain averments in the amended petition, but in a separate paragraph attempted to assert for the first time a new defense not theretofore relied upon.

Upon another trial the plaintiff secured a verdict for $17,500.00 in damages, and upon the court's refusal to grant the defendant a new trial, it prosecutes this appeal from that judgment.

It is again urged that the last verdict is excessive and the basis of that contention is that the evidence upon the last trial is no more positive and satisfactory as to the permanency of the injuries than it was on the first trial.

A short restatement of the manner in which the injury occurred may be enlightening in our consideration

of the evidence heard upon the last trial touching the injuries. The injury occurred in October, 1922, plaintiff at the time being 29 years of age, weighing about 180 pounds, and, as the evidence shows, lithe, athletic and active. He was employed as brakeman in the yards at Hazard and when he started to go down from the top of a moving freight car on the ladder at the side his body came in contact with the top of a shed not more than 17 inches from the car, the track of the railroad having been moved nearer to the shed, without notice to him, only a few days before. The shed struck him about the hip and he fell some ten or more feet to the ground, his back striking in about the center across a rail of the track. He was unconscious when found in that position a few minutes later, was immediately taken to a hospital, where he remained for only three days when he was taken to his home, where he was confined for several weeks. At the expiration of that time he was able at times to walk slowly around the streets in a stooped position and bent to one side. Never since that time has he been able to do more than walk slowly in that same position, and the evidence upon the last trial tended strongly to show that his condition was progressive, and that he was not as well as he had been at the former trial two and one-half years theretofore. The first trial was held a little more than one year after the injury, and the last trial approximately three and one-half years thereafter.

Prior to the first trial two sets of X-ray pictures of plaintiff had been taken, one in Louisville by Dr. Keith, and one in Cincinnati by Dr. Lange. Upon that trial some ten or eleven doctors testified, some of whom were experts in the reading of X-ray pictures, and some of whom were not, but Dr. Lange, who took one set of those pictures, did not testify. After the first trial other X-ray pictures were taken by Dr. Heilman of Frankfort, and upon the last trial, in addition to the experts testifying upon the first, Dr. Lange and Dr. Heilman were introduced by the plaintiff. The former opinion deals at length with the evidence of the physicians testifying upon the first trial, and reaches the conclusion, not that their evidence as a whole did not authorize a submission to the jury upon the question of permanent injury, but from such analysis the conclusion was reached that the evidence was not of that positive and satisfactory character

necessary to uphold such a large verdict, and that therefore it was excessive.

Dr. Heilman testified that he was a graduate of the University of Louisville, and had been engaged in X-ray work since 1914, and had on the average in the last six or seven years taken from 30 to 50 X-ray pictures per week. He filed the two pictures so taken by him, and said he found from them that there had been a fracture of the lamina of the eleventh and twelfth dorsal vertebrae, and in addition found calcified glands. He said he observed the attitude of the plaintiff and the way he walked, and that he walked considerably stooped and awfully stiff in the back; that the cartilage between the eleventh and twelfth dorsal vertebrea did not seem to be as thick as between the other vertebrae, which was not a normal condition; that the plaintiff's pulse was 110, while 72 was normal, and that he was in a general run-down condition and very anaemic. The witness also stated that from his personal examination of the plaintiff, and from what he found in the X-ray picture taken by him, and from the history of the case set forth in a hypothetical question, that his injuries were permanent, and that he would never probably be able to do any physical work which requires moving, and probably not competent to do any work whatever. This evidence was given in a deposition take only a few weeks before the last trial.

Dr. Lange testified that he had been specializing exclusively in X-ray work for twenty years; that he was a professor of radiology in the University of Cincinnati Medical School, was director of the X-ray department of the Cincinnati General Hospital, and radiographer of three private hospitals in Cincinnati, and had been conducting an X-ray laboratory in Cincinnati for twenty years. That he was a graduate of the Medical Department of the University of Cincinnati, and had taken post-graduate studies in London, Paris and Vienna, as well as in many of the larger medical schools in this country, and was ex-president of the American Roentgen Ray Society, which is the national organization of X-ray physicians. The witness stated he had made an X-ray examination of the plaintiff in March, 1923, and that the pictures he had taken of him truly and accurately revealed the conditions in his body, that the pictures so taken were in the same condition as when taken by him. While he was thus

qualifying as an expert counsel for defendant present at the taking of his deposition admitted "that Dr. Lange is thoroughly qualified by experience and education for the purpose of taking X-ray pictures. It is admitted by defendant that Dr. Lange is thoroughly qualified by education and experience as an X-ray expert."

The witness then proceeded to state that his film No. 1 "Shows the presence of fractures of the eleventh and twelfth dorsal vertebrae, the fractures being located at the point where the bony covering of the spinal cord shows the body of the vertebrae. In other words, the fractures are adjacent to and in close relation to the spinal cord."

Testifying as to his film No. 2 he says it

"Shows a front view of the spine of J. B. Lewis. This shows some indistinctness of the body of the eleventh and twelfth dorsal vertebrae, showing that they have been slightly mashed."

Testifying as to his film No. 3 he says it

"Shows the lower portion of the spine of J. B. Lewis, and does not show the injury, because it was made lower down in order that the entire spine would be covered."

The witness then proceeded to answer a question partially hypothetical and partially based upon his examination of the plaintiff, and what the X-ray pictures showed, that in his opinion his injuries were permanent. And further proceeded, saying:

"I believe that this man is permanently injured; firstly, because of the nature of the injury as shown in the X-ray pictures, which was right next to the spinal cord. Secondly, because of the persistence of the disability from the time I made my X-ray examination until the present moment today (and) because of the manner in which he is compelled to walk and carry himself.

"Q. Doctor, will you kindly look at him right now, what is his condition as to being nervous?

"A. He seems to be extremely nervous, showing constant tremor of the right hand.

"Q. Suppose his pulse, say three weeks ago, was 110, what would that indicate to you in connection with the rest of the history of the case which you have heard and which you have seen?

"A. That would indicate a severe nervous disturbance.

"Q. What about the injury to this man in your opinion as a physician, as to there being any reasonable hope for him to do any kind of work? Relating or any such mental or sedentary (work) as the average business man or the average American corporation would require of an average employee? I ask you to keep in mind the history of the case in answering the questions.

"A. I do not believe that he will be able to do any hard physical labor. As to the mental side of it I am not qualified to answer."

This deposition was likewise taken only a short time before the last trial.

In addition to the evidence of these two experts taken just before the last trial, we have the further fact that at the last trial plaintiff's condition was even worse than upon the first trial; that since his injury, approximately three and one-half years theretofore, he had never been able to do a stroke of physical labor; that throughout that period he had been able to walk only slowly in a very stooped and twisted position; and then when we consider the improbability that a man weighing 180 pounds could fall approximately ten feet, striking his back directly across a steel rail, without serious injury, and when we take into the estimate the fact that two juries have returned verdicts for such amounts as manifestly were based upon their belief that his injuries were permanent, there no longer exists any ground upon which to say that the evidence of permanency is not so positive and satisfactory as will justify this court in setting aside the verdict.

Nor is the verdict excessive for such permanent injuries. The plaintiff was a young man of 29 years of age and had a life expectancy of 30 years or more; he was active, alert and vigorous, and was at the time not only earning about $175.00 a month as his regular pay, but frequently earned in the form of extra pay for extra time much more than that. The injury has not only deprived

him of his whole future earning capacity, but it has deprived him of the opportunity of earning promotion, and consequently higher compensation in his chosen work.

But it is urged for appellant that the trial court erred in striking out of its amended answer, filed after the return of the case, a paragraph wherein it alleged, in substance, the plaintiff was employed by defendant in May, 1919, and upon being required before such employment to file a written application therefor he was called upon to answer certain questions, and that in answering them plaintiff had stated that he was employed by the C., N. O. & T. P. R. R. Co. as a brakeman from March, 1912, until October, 1914, and that he had been discharged, and further stated that from the latter date until his application for employment by defendant he had been engaged in farming. It is charged that these answers were false, and that they were relied upon by defendant without knowing their falsity, and that it would not have employed defendant if it had known the real facts. It is then charged that plaintiff was not discharged by the said railroad company, but had been in October, 1914, injured while working for that company, and had quit its service for that reason, and that he had not been engaged in farming as stated by him, but had in fact for a great part of that time been incapacitated by his injuries so referred to. It then charges that after his said injury while in the service of the C., N. O. & T. P. R. R. Co. he filed an action against that company wherein he alleged that his left leg had been broken above the ankle so as to cause him to lose the use of the same, and that a portion of the bone in his left foot had been lost in the accident, and that his ankle joint had become rigid, and that defendant in ignorance of these facts had employed plaintiff and would not have employed him if he had not fraudulently misrepresented facts to it.

It is now said that because of the plaintiff's fraud in thus procuring employment, the relation of master and servant never existed between the plaintiff and defendant, and defendant did not, therefore, owe to him the duties of an employee.

In other words, the contention now is that because plaintiff by his fraud created the contractual relationship between him and defendant that the latter is not liable to plaintiff in his action for a tort committed by it whereby he was injured during such employment.

Reliance is had by appellant upon the three cases of N. & W. R. R. Co. v. Bondurant, 107 Va. 515, 15 L. R. A. (N. S.) 443; Stafford v. B. & O. R. R. Co., 262 Fed. 807; and Fitzmaurice v. N. Y. N. H. & H. R. Co., 192 Mass. 159, 6 L. R. A. (N. S.) 1146.

It may be admitted that the Bondurant case is somewhat similar to this. There Bondurant, a minor, by permission of the company, was riding upon its engine to the end that he might learn the duties of a fireman in the company's service. In his application he falsely stated he was past 21 years of age, and the company had a rule against the employment of minors in train service. While so acting he was killed in a collision, and the court held but for his fraud and misrepresentation he would not have been upon the engine, and that he was therefore a trespasser or a bare licensee to whom the railroad company stood in no contractual relation and to whom it owed no other duty than not to injure him recklessly, wantonly or wilfully.

The Stafford case is not in point. There the company had a rule requiring applicants for positions as brakemen to be within a certain age, and they were required to appear before a medical examiner and undergo a physical examination. Stafford being over the required age and physically unable to pass the medical examination secured another to take the examination in his name, and a certificate was issued in Stafford's name. When, therefore, he received an injury and sued, the court held that because of his fraud he never in fact became an employee of the company.

Likewise the Fitzmaurice case has no application. There one obtained on a railroad a reduced rate for transportation by fraudulent representation, and while so traveling was injured, and the court held that because of such fraud in procuring the reduced rate the passenger occupied no different status from that of a trespasser.

So that the Bondurant case from Virginia is the only authority having any similarity to the facts here, and even that is not only distinguishable, but has been criticized in the opinions of many other jurisdictions. In this case the only allegation is that platintiff fraudulently stated he had been discharged, when in fact he had merely given up the employment because of an injury that temporarily unfitted him for the service; but there is no allegation that at the time he entered into appellant's

service he was incapacitated by reason of his former injuries from rendering that service, but only the allegation that if defendant had known of such former injuries and that he had not been discharged it would not have entered into the contract of employment.

But even in cases having a similar state of fact to that in the Bondurant case, the decided weight of authority is that, even though there is a false representation as to the age of the applicant for a position, unless that age has some direct connection with the subsequent injury, or contributed to bring it about, then the fact of such misrepresentation in procuring the employment does not change the status of master and servant existing between the parties.

For instance, in St. Louis, etc., v. Brantley, 168 Ala. 579, it was held that a misrepresentation of a servant as to his age in a contract of employment is no bar to his right to recover for injuries while in the service, unless his immaturity immediately contributed to the injury.

Likewise in Lupher v. Atchison, etc., R. R. Co., 81 Kansas 585 (25 L. R. A. N. S. 707), it was held that if one obtained employment by misrepresenting his age he might still recover for injuries suffered in the service unless it appeared that the accident was occasioned by his minority or immaturity.

In this case there can be no claim that plaintiff's former injury had any causal connection whatsoever with his last injury, which the evidence convincingly shows was brought about because of the proximity of the roof on the shed to the railroad track.

The case of Payne, Agent v. Daugherty, 283 Fed. 353, is nearer like this case than any we have seen. There the plaintiff procured employment as a brakeman by false misrepresentation as to former employment, and the defendant made the same defense that it here made. The court, in responding to the contention that certain evidence had been improperly excluded, said:

> "The complaint is not that proof is incompetent which tended to attribute the fall from the car to prior injury or affliction. That is far different from permitting a retroactive dissolution of the relation of master and servant by virtue of the contract, which, even if voidable, was, while it subsisted, attended with the duty required by law for the safety of the latter,"

and the court in that opinion expressly approved of the rule laid down in the Lupher case above cited.

The Lupher opinion and the note appended to it in 25 L. R. A. (N. S.), show not only that the weight of authority is against appellant's contention, but the reason given in those cases, contrary to the Virginia rule, appear to be much more safe and sound.

But it is said the first instruction authorized a recovery for lost time when the pleadings did not cover it. That contention is based upon the language of the instruction, which authorizes a recovery for

"A reasonable sum for his pain and suffering, and also a fair recompense for the loss of what he otherwise would have earned in his trade or profession and has been deprived of his capacity for earning by the negligence of defendant."

Clearly the language used has reference to future earnings and not to loss of time because of the injury; nor does that instruction by any fair interpretation authorize a recovery for future suffering as contended, but in the customary form authorizes only a recovery for pain and suffering and the permanent impairment of earning power.

The contention that the contributory negligence instruction was erroneous cannot be sustained. That contention is based upon the fact that the instruction, after reciting the several respects in which the plaintiff might have been charged with contributory negligence, says:

"And that but for such contributory negligence, if any, the accident and injury would not have occurred."

Conceding for the purpose of this opinion that the quoted words were improperly embraced in the instruction, yet under the facts of this case it could not have been prejudicial, for the reason that there was in fact no evidence of contributory negligence authorizing the instruction at all.

This court in the former opinion did not directly consider the question of contributory negligence, but did hold in terms that

"Trainmen may assume, while discharging their duties on moving trains in the usual and customary

manner, that the place they are working is safe, and are not required to be on the lookout for obstructions along the right of way that may injure them. Appellee testified that he. had not learned of the track being shifted so close to the shed as to be dangerous, and that he did not see the dangerous condition or situation before he was injured.''

There was no evidence tending to show that the plaintiff did see or observe the dangerous situation, and as he had a right to assume there was none such, in the absence of evidence that he saw it, there was nothing to justify the giving of an instruction on contributory negligence.

A careful inspection of the record fails to disclose any reversible error.

Judgment affirmed.